1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   TODD ASHKER,                          No.  1:21-cv-00423-NONE-EPG (PC)

12                  Plaintiff,             FINDINGS AND RECOMMENDATIONS,
                                           RECOMMENDING THAT THIS ACTION
13          v.                             PROCEED ON PLAINTIFF'S CLAIMS
                                           AGAINST (1) DEFENDANTS KERNAN,
14   C. PFEIFFER, et al.,                  DIAZ, ALLISON, ALFARO, GIPSON,
                                           MOAK, PARIS, PRELIP, PEREZ, PFEIFFER,
15                  Defendants.            ALAFA, HIGHTOWER, ORTIZ, STEBBINS,
                                           HAMMER, AND SPEIDEL FOR
16                                         RETALIATION IN VIOLATION OF THE
                                           FIRST AMENDMENT; (2) DEFENDANTS
17                                         KERNAN, DIAZ, ALLISON, ALFARO,
                                           GIPSON, MOAK, PEREZ, PARIS, PRELIP,
18                                         PFEIFFER, ALAFA, HIGHTOWER, ORTIZ,
                                           AND STEBBINS FOR VIOLATION OF THE
19                                         EIGHTH AMENDMENT FOR
                                           UNCONSTITUTIONAL CONDITIONS OF
20                                         CONFINEMENT; AND (3) KERNAN, DIAZ,
                                           ALLISON, ALFARO, GIPSON, MOAK,
21                                         PEREZ, PARIS, PRELIP, PFEIFFER, ALAFA
                                           FOR VIOLATION OF THE FOURTEENTH
22                                         AMENDMENT'S DUE PROCESS CLAUSE.

23                                         (ECF No. 10)

24                                         OBJECTIONS, IF ANY, DUE WITHIN
                                           TWENTY-ONE (21) DAYS
25
                                           ORDER GRANTING PLAINTIFF'S NOTICE
26                                         OF MOTION AND MOTION FOR
                                           EXTENSION OF TIME TO RESPOND TO
27                                         THE COURT'S JULY 29, 2021 ORDER; AND
                                           TO BE PERMITTED TO EXCEED THE
28                                         ORDER'S SPECIFIED PAGE LIMIT OF (30)

                                          1

1

2

3

4

5

6

7

PAGES BY (3) ADDITIONAL PAGES BE GRANTED

(ECF. NO. 58)

ORDER GRANTING DEFENDANTS' REQUEST FOR SCREENING OF PLAINTIFF'S SECOND AMENDED COMPLAINT

(ECF. NO. 59)

8    Plaintiff Todd Ashker ("Plaintiff") is a state inmate proceeding *pro se* in this civil rights

9   action pursuant to 42 U.S.C. § 1983.  Plaintiff's Second Amended Complaint ("SAC") is before

10   this Court for screening.  (ECF No. 57).  The SAC bring claims concerning his treatment at Kern

11   Valley State Hospital ("KVSP") including his treatment following a settlement agreement in a

12   separate case regarding the procedures the prison may and may not use to keep inmates in solitary

13   confinement.

14    The Court has reviewed the SAC, and for the reasons described below, will recommend

15   that this action proceed on Plaintiff's claims against (1) Defendants Kernan, Diaz, Allison,

16   Alfaro, Gipson, Moak, Paris, Prelip, Perez, Pfeiffer, Alafa, Hightower, Ortiz, Stebbins, Hammer,

17   and Speidel for retaliation in violation of the First Amendment; (2) Defendants Kernan, Diaz,

18   Allison, Alfaro, Gipson, Moak, Perez, Paris, Prelip, Pfeiffer, Alafa, Hightower, Ortiz, and

19   Stebbins for violation of the Eighth Amendment for unconstitutional conditions of confinement;

20   and (3) Kernan, Diaz, Allison, Alfaro, Gipson, Moak, Perez, Paris, Prelip, Pfeiffer, Alafa for

21   violation of the Fourteenth Amendment's Due Process Clause.  The Court recommends that the

22   claim against Defendants Stebbins and Hammer for excessive force be dismissed with prejudice.

23   The Court will also recommend that all other claims be dismissed.

24    The parties have twenty-one days from the date of service of these findings and

25   recommendations to file his objections.

26   **I.    PROCEDURAL BACKGROUND**

27    **A.    Plaintiff's Class Action Lawsuit**

28    Plaintiff is the lead plaintiff in the class-action lawsuit *Ashker v. Brown*, No. C 09-5796

CW (N.D. Cal), in which California inmates claimed that their assignment to an indeterminate term in the Secured Housing Unit ("SHU") at Pelican Bay State Prison ("PBSP") violated their constitutional rights under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment.  On May 6, 2016, the clerk entered judgment in accordance with the Order Granting Final Approval of Class Action Settlement Agreement, which awarded class members declaratory and injunctive relief.

### B.      Plaintiff Files Complaint in Northern District of California

Plaintiff filed a complaint in the Northern District of California on October 17, 2018, against prison officials at KVSP and his previous prison. (ECF No. 1).[1] The Northern District of California screened the complaint on May 28, 2020.  (ECF No. 10).  The Court dismissed Plaintiff's claims for declaratory and injunctive relief arising from his confinement in the Pelican Bay State Prison SHU on the basis that they duplicate claims in the class action and fall within the ambit of the settlement agreement.  (ECF No. 10, at p. 2).  The Court also dismissed Plaintiff's claims for breach of the settlement agreement and for seeking enforcement of the settlement agreement without prejudice to Plaintiff bringing such claims in the class action through class counsel.  (ECF No. 10, at p. 2).  The Court found that Plaintiff could "proceed in this action with his claims for damages arising from his placement in … the ASU at KVSP." (*Id.*).

Plaintiff filed the FAC on September 2, 2020. (ECF No. 43). The Defendants in the FAC filed a motion to dismiss on September 17, 2020. (ECF No. 23). Among other things, they argued that Defendants related to KVSP were misjoined and should be dismissed or severed and transferred to this district.

On March 11, 2021, District Judge William Alsup of the Northern District of California granted the motion in part, severed the claims against Warden C. Pfeiffer, Sgt. A. Alafa, Officer Hightower, Officer Manual Ortiz, Capt. Hammer, Lt. Speidel, and Associate Warden Stebbins at Kern Valley State Prison, and transferred the severed claims to this district. (ECF No. 37). The court also found that, "[w]hen liberally construed, the allegations in the FAC against the newly-

---

[1] A redacted copy of the original complaint has been filed at ECF No. 34. His proof of service is dated October 1, 2018. (ECF No. 34-1 at 57).

1    named Defendants S. Alfaro, C. Gipson, and R. Diaz are cognizable." (*Id.* at 6). On March 15,

2    2021, the transferred action in this district was opened. (ECF No. 38).

3            **C.      This Court Screens Plaintiff's Complaint and Gives Leave to Amend**

4            Defendants filed a motion that requested the Court screen the FAC on March 26, 2021,

5    (ECF No. 42), which the Court granted, (ECF No. 44). On April 30, 2021, this Court issued a

6    screening order finding that Plaintiff's FAC violated Rule 8 because it failed to set forth a short

7    and plain statement of the claim showing Plaintiff is entitled to relief.  The Court gave Plaintiff

8    leave to file an amended complaint limited to no longer than twenty-five pages and limited to

9    claims arising from Plaintiff's time at KVSP.  (ECF No. 48).

10           On July 28, 2021, the Court in the Northern District of California severed and transferred

11   additional claims and Defendants to this District, including Defendants Ralph Diaz, Sandra

12   Alfaro and Connie Gipson. (ECF No. 54).

13           On July 29, 2021, the court provided additional time to respond to the screening order and

14   gave Plaintiff leave to file an amended complaint no longer than 30 pages, which may include the

15   newly transferred claims against Diaz, Alfaro, and Gipson.

16           Plaintiff filed his SAC on September 27, 2021.  (ECF No. 57).  The SAC is 32 pages long.

17           Plaintiff filed a motion for extension of time to respond to the Court's July 29, 2021 order

18   and to be permitted to exceed the specified page limit on October 4, 2021.  (ECF No. 58).

19   Plaintiff also requested permission to add a defendant, Alexandria Perez.

20           On October 19, 2021, Defendants filed a request for this Court to screen Plaintiff's

21   Second Amended Complaint and to extend the deadline to file a responsive pleading, if

22   necessary, until 30 days after the Court issues its final screening order. (ECF No. 59)

23           On November 4, 2021, the claims against Diaz, Alfaro, and Gipson were opened under

24   another case number, 1:21-cv-01611-HBK.  On November 19, 2021, Magistrate Judge Barch-

25   Kuchta granted the motion to consolidate the cases so that they may be consolidated into one case

26   under this case number.

27           Thus, now before this Court is Plaintiff's Second Amended Complaint against already

28   served Defendants Warden C. Pfeiffer, Sgt. A. Alafa, Officer Hightower, Officer Manual Ortiz,

1  Capt. Hammer, Lt. Speidel, and Associate Warden Stebbins, Diaz, Alfaro, and Gipson as well as

2  unserved Defendant Alexandria Perez.

3  **II.    SCREENING REQUIREMENT**

4           The Court is required to screen complaints brought by inmates seeking relief against a

5  governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The

6  Court must dismiss a complaint or portion thereof if the inmate has raised claims that are legally

7  "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek

8  monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1), (2).

9  As Plaintiff is proceeding *in forma pauperis*, the Court may also screen the complaint under 28

10  U.S.C. § 1915. "Notwithstanding any filing fee, or any portion thereof, that may have been paid,

11  the court shall dismiss the case at any time if the court determines that the action or appeal fails to

12  state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii).

13          A complaint is required to contain "a short and plain statement of the claim showing that

14  the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not

15  required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere

16  conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell*

17  *Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Plaintiff must set forth "sufficient factual

18  matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting

19  *Twombly*, 550 U.S. at 570). The mere possibility of misconduct falls short of meeting this

20  plausibility standard. *Id.* at 679. While a plaintiff's allegations are taken as true, courts "are not

21  required to indulge unwarranted inferences." *Doe I v. Wal-Mart Stores, Inc*., 572 F.3d 677, 681

22  (9th Cir. 2009) (citation and quotation marks omitted). Additionally, a plaintiff's legal

23  conclusions are not accepted as true. *Iqbal*, 556 U.S. at 678.

24          Pleadings of *pro se* plaintiffs "must be held to less stringent standards than formal

25  pleadings drafted by lawyers." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (holding that

26  pro se complaints should continue to be liberally construed after *Iqbal*).

27  \\\

28  \\\

5

1   **III.     ALLEGATIONS IN THE FAC**

2          The SAC alleges as follows:

3          **A.      Plaintiff's Involvement in Class Action Lawsuit**

4          Plaintiff is the named plaintiff in a settled class-action lawsuit, *Ashker v. Newsom*, No.

5   4:09-cv-5796, filed in the Northern District of California. That lawsuit challenged long-term

6   confinement of inmates in the security housing unit at PBSP. The lawsuit "brought global

7   exposure & condemnation" to the practices of California Department of Corrections and

8   Rehabilitation ("CDCR") with respect to solitary confinement.

9          Plaintiff is also a co-founder of the PBSP-SHU, SCC-PHRM groups formed in 2010 by

10  similarly situated, long-term solitary confinement prisoners of all racial groups for the purpose of

11  wide-spread education and exposure of CDCR's state sanctioned torture.

12         The class-action parties entered into a settlement agreement September 1, 2015.

13         **B.      Plaintiff Arrives at KVSP**

14         Relevant to the allegations at KVSP, the SAC alleges that on February 5, 2016, the week

15  prior to Plaintiff's release to KVSP General Population ("GP"), Chief Robertson issues the

16  following order to KVSP A facility Defendant Hightower, Ortiz et al: "CSU recommends release

17  to the g.p. where enemies are not housed, contingent in that Ashker is able to avoid conflict in his

18  future involvement s/affiliates of the AB, and/or affiliates of other STG-1s."

19         On February 12, 2016, Plaintiff was released to KVSP A Facility g.p. 1-block, where he

20  was on Max A Custody & A2/B Privilege Group, resulting in only 5-to-7 hours per week out of

21  cell time, with all meals still being fed in cell.

22         Upon his arrival, prisoners told him that one week before he got there, 1-block, 2d watch

23  floor officer Defendant Hightower told his porters "Todd Ashker's coming from PBSP soon,

24  you've probably heard of him, and I'm just giving you the heads-up that his own people want to

25  kill him."  Hightower also personally told Plaintiff "I know who you are, and I know all about

26  your lawsuit; and I'm the CCPOA Rep. here at KVSP, who's been going to meetings at CDCR

27  Headquarters, to oppose your lawsuit."  Hightower is also a former gang-unit member.  Plaintiff

28  alleges that Hightower's intent was to plant a seed in prisoners' minds that Plaintiff was targeted

1   and hoped that a prisoner would "run with it" by dropping a note saying Plaintiff was going to be

2   attacked, in order to justify Plaintiff's return to solitary for safety-concerns investigation.

3      Plaintiff alleges that Defendants Pfeiffer, Alafa, Hightower, Ortiz, Stebbins, Hammer, and

4   Speidel all approved and directed of such a plan to use unreliable confidential information to keep

5   Plaintiff in solitary confinement.

6      The A facility operated more like a Modified-SHU Control Unit, than a G.P., with less out

7   of cell time, meals in cell, no access to jobs, education, vocation, rehabilitation, in violation of the

8   settlement agreement.

9      Plaintiff wrote a memo to the lead Defendant Kernan addressing how the housing failed to

10  comply with the Settlement Agreement.  Plaintiff also attended compliance monitoring meetings

11  related to the Settlement Agreement, during which Defendants were angry and hostile to Plaintiff.

12     Shortly after the litigation-related meeting, Defendant Hightower told Plaintiff "words

13  come down from headquarters that you're not to be treated differently than other prisoners here."

14  **C.      Instances of Retaliation**

15     Plaintiff then lists instances of alleged retaliation.  Plaintiff described a tier-raid of

16  Plaintiff's tier, during which Hightower personally participated in tearing-up/trashing Plaintiff's

17  cell.  Another guard working on A. facility, 1-block, 3d watch told his porters he's "not able to

18  allow them to run around the tiers after dinner anymore because Ashker is at Inmate Advisory

19  Counsel [IAC] meeting, telling on staff."  Defendant Ortiz tried to end Plaintiff's visit with his

20  fiancée early, and when that failed, threatened to put Plaintiff on visiting restriction by falsely

21  claiming they had "too much contact."

22     Plaintiff and Defendants held another meeting on November 17, 2016 to discuss perceived

23  distance/misunderstandings between the parties re: terms, spirit, and intent of the settlement

24  agreement.

25     Plaintiff believes his confidential legal communications are monitored by Defendants.

26     In December 2016, Plaintiff created a detailed group 602 appeal regarding visiting issues

27  raised at the semi-annual meeting.  In response, Defendants Hightower and Ortiz, among others,

28  began tearing up and trashing all cells, making visitors wait for an hour or more for their prisoner

1    to arrive, cancelling visits after an hour or less.  Other prisoners told Plaintiff that staff had told

2    them to thank Ashker for the cell trashing and visiting treatment, behind him pushing paperwork

3    against the staff.  This was stated by Hightower when Plaintiff was present.

4        In December, 2016, Plaintiff was brought out late to the visit room.  Upon arrival, Ortiz

5    told him, "I hear you have a complaint against me behind visiting."  After the December 2016

6    visit, Plaintiff told Ortiz "My fiancé is afraid to come visit after the way she was treated in

7    October."  Ortiz replied "If that made her afraid, she should be afraid, because people get run

8    over just walking down the street around here all the time."

9        Plaintiff sent his litigation counsel a declaration summarizing CDCR retaliatory acts.

10   Counsel informed CDCR Defendants of intent to file an ongoing retaliation motion on Plaintiff's

11   behalf.  In response, CDCR Defendants, including KVSP agents Stebbins, Hammer and Speidel

12   locked down the entire A Facility GP on March 20, 2017, by using confidential information

13   ("C.I.") as a pretext.  In this instance, they alleged to have an anonymous note stating that

14   Plaintiff was planning to have 1-block staff assaulted with weapons.  All Defendants knew this

15   was false.  Plaintiff's leadership role focuses on seeking peaceful/legal avenues for positive

16   reform.  The three sergeants involved agreed with Plaintiff and returned Plaintiff to his cell.

17       **D.    Cell Extraction**

18       Soon after returning to his cell, staff told Plaintiff to pack up his property to go to

19   Administrative Segregation Unit ("ASU") for a 90-day Staff Threat Investigation.  Plaintiff

20   refused to go voluntarily and said they would have to extract him.  Defendants Stebbins and

21   Hammer ordered Lt. Speidel to initiate a cell extraction.  They fired two gas grenades into

22   Plaintiff's cell, sprayed pepper spray on Plaintiff's head area, and then ran into the cell with riot

23   gear.  Guards placed Plaintiff in leg shackles and Ortiz used a wheelchair to take Plaintiff to the

24   ASU.  Ortiz told Plaintiff "Ashker, I thought you were stupid, pushing paperwork and telling on

25   staff.  Now you're outta here for good."

26       Plaintiff was housed in solitary confinement from March 20, 2017, until March 31, 2017.

27   Chief Deputy Warden Tolson chaired Plaintiff's ICC hearing and explained that he checked into

28   the staff threat and knew there was no validity to it.  He ordered Plaintiff to be released to B

8

1  Facility GP on April 1, 2017.  As soon as he arrived at B facility, other prisoners told Plaintiff

2  that A facility staff had trashed all of the cells there after Plaintiff's extraction and told the

3  prisoners they should thank Ashker for it.

4       **E.     Attorneys Banned**

5       Plaintiff also alleges that Defendants interfered with his right to assistance of counsel.

6  Plaintiff's attorney, Carole J. Travis, sent KVSP Warden Pfeiffer a letter on August 16, 2016,

7  regarding "Interference s/Confidential Legal Mail," Attorneys Weills and Travis were the most

8  active members of the class action litigation team.  On March 3, 2017, Defendant Gipson advised

9  attorneys Weills and Travis that they were "temporarily banned" from all CDCR Institutions, as

10 well as confidential calls/visits/mail, pending the outcome into potential violations of Cal. Code

11 of Regs Title 15, § 3178(s)(3).  On April 10, 2017, Defendant Allison informed Weills, CDCR's

12 investigation had concluded that she had numerous and extensive illegal cell-phone

13 communications with inmates, jeopardizing the security of CDCR institutions, and her lifetime

14 ban would be upheld.  During Diaz' term as CDCR Secretary, he too upheld this ban, as has the

15 current secretary Allison.

16      Defendants Kernan, Allison and Gipson imposed an 18-month ban on Travis based on

17 similar alleged conduct as Weills.

18      Plaintiff has never been notified of, nor charged with, anything regarding the alleged

19 illegal cell phone communications.  He has been charged with possessing four cell phones, which

20 were introduced to KVSP A facility by Defendants' agents.  Plaintiff's communications with

21 Weills and Travis were due in large part to the fact that Defendants' agents violated his right to

22 confidential communications with Weills and Travis.  Such communications were not in the

23 capacity of lawyer-client, but were strictly personal, regarding Plaintiff's concerns about his

24 fiancée's well-being in the U.K. and personal difficulties adjusting to G.P. after decades in

25 solitary confinement.

26      The penalty assessed on Plaintiff's attorneys were grossly disproportionate to penalties

27 imposed on other attorneys engaged in cell phone conversations with prisoners.

28      Attorney Dan Siegel, who has also supported the Ashker case members and Plaintiff,

1    assisted Plaintiff with a few legal things after he visited Plaintiff at KVSP.   On February 14,

2    2019, Plaintiff had a 2-hour legal visit with Siegel in KVSP's BPH Building.   Attorney Siegel had

3    formally joined the Ashker class action legal team.   In advance of the meeting, Plaintiff asked

4    lead counsel, Jules Lobel, to send Plaintiff some documents.   Attorney Siegel provided some

5    documents to Plaintiff, which inadvertently included Attorneys Eyes Only documents regarding

6    Plaintiff's retaliatory housing placement subject.   Plaintiff told his counsel about these

7    documents.   They advised Defendants' counsel of the error, and Plaintiff provided the documents

8    to KVSP Captain Martinez, who sent them to Lobel.

9        Defendants Diaz, Gipson, and other used this honest mistake to ban Plaintiff from

10   communicating or visiting with Attorney Siegel, depriving Plaintiff of assistance on the Ashker

11   case as well as new cases.

12       Defendant Gipson sent Attorney Siegel a letter on March 15, 2019, stating that the

13   punishment would be a lifetime exclusion from confidential privileges, including visiting,

14   telephone, and mail privileges.   This ban was reduced to 10 years, which remains grossly

15   disproportionate for Attorney Siegel and Plaintiff, who is deprived of representation.   Although

16   Attorneys Weills and Siegel expressed interest in representing Plaintiff in the present case, the

17   bans prevented this and Plaintiff was unable to find replacement counsel.   The loss of the support

18   of these attorneys caused Plaintiff emotional harm.

19       **F.      Plaintiff Placed in ASU**

20       On May 1, 2017, Plaintiff had been on B facility for a month, and on C privilege group

21   status the entire time.   He received mail indicating domestic issues with his fiancée had worsened.

22   Plaintiff asked the captain for help to contact his attorney or fiancée to check on her well-being.

23   The captain asked Plaintiff to wait in the office.   In a few minutes, gang-investigators came to the

24   office and asked him, "What's was going on?"   They asked more questions, including, "Is he

25   responsible for putting [his] fiancée in danger," and "What are his concerns about his own

26   safety?"

27       After some further discussion, someone behind Plaintiff asked him if he's ready to sign

28   the "agreement to debrief."   Plaintiff agreed to sign, although he had no intention to debrief.   He

1   signed the paper, but put a clause next to his signature stating, "subject to certain conditions."

2   Plaintiff believes his additional clause automatically nullified the agreement.

3       After that, Defendants including Alafa, sent Plaintiff to ASU due to "self-expressed

4   concerns," which was false.  Plaintiff then threatened to go on a hunger strike in protest.  Staff

5   then claimed that Plaintiff was suicidal and put him on suicide watch.  Plaintiff refused to eat and

6   drink for 3 days, but told staff he was not suicidal.

7       On May 3, 2017, Plaintiff was still in the medical clinic on suicide watch when

8   Defendants agents placed Plaintiff in a yard cage at the end of the tier.  A few minutes later, an

9   AB dropout who had been working with the CDCR since 2016 sat nearby.  Plaintiff believed it

10  was a setup.  He let the dropout do most of the talking about why he went to CDCR's side.

11  Plaintiff replied that "all he's said was b.s. and wrong," which ended the conversation.

12      The evening of May 3, 2017, West showed up to get Plaintiff to debrief.  Plaintiff said he

13  was advised not to talk to anyone.  West stated, "the Department recognized Plaintiff wasn't in

14  the right mind on May 1 and had stepped back in response.

15      On May 7, 2017, ASU-2 undercover C.I. gave a prison agent a note that C.I. had

16  manufactured and claimed another prisoner on tier had sent C.I. stating Plaintiff told him Plaintiff

17  was dropping out.  This was false.

18      On May 8, 2017, Plaintiff was taken to ASU-2 Committee Room, where West and

19  Clayton were seated.  They told Plaintiff their "superiors asked us to make a full presentation of

20  debrief process, in case your attorney has any questions when you talk to him."  Clayton said that

21  people were talking bad about Plaintiff and his only option at this point was to debrief.  He said

22  he wanted to help Plaintiff successfully come over to CDCR's side.  Plaintiff never intended to

23  debrief.  He said he was only worried about his fiancée.

24      On May 10, 2017, Plaintiff send a CDCR-22 form explaining that his ASU placement was

25  solely regarding concerns about outside loved ones, which were resolved.  He requested to return

26  to B. Facility, G.P.

27      On May 10, 2017, Defendants Diaz, Allison, Alfaro and Gipson exchanged emails

28  regarding Plaintiff's ASU placement.  They created a plan to continue Plaintiff's solitary

1   confinement indefinitely.  For example, Diaz wrote Allison, "Let's talk tomorrow.  I would think

2   he would be a retention in ASU pending resolution of his concerns.  Let's not get pushed into

3   anything by his attorneys."

4        On May 11, 2017, Defendant Pfeiffer chairs Plaintiff's ICC meeting.  Pfeiffer orders

5   Alafa to conduct a safety concern investigation and retain Plaintiff in the ASU pending

6   completion.  Plaintiff's repeated denial of safety concerns and requests for correction of the

7   falsehood are ignored.

8        On May 18, 2017, Defendant Alafa interviewed Plaintiff regarding a safety concerns

9   investigation.  Alafa disclosed a summary of the Confidential Memorandum.  Plaintiff denied

10  C.I.'s allegation and said he has no safety concerns.  Alafa closed his investigation on May 18,

11  2017, recommending Plaintiff's release to KVSP A or B Facility G.P. and forwarded the report to

12  Pfeiffer, who approved it and let it stand.

13       On June 1, 2017, chief Deputy Warden Tolson Chaired Plaintiff's ICC and approved

14  Plaintiff's release back to B. Facility, G.P.

15       By 11:45 am, Plaintiff was on the way to B. Facility, only to have the bus u-turn and

16  return to ASU-2.  A sergeant tells Plaintiff, "Warden said not to release you," and "I've been

17  ordered to isolate you on H tier."

18       On June 1, 2017, at 7:45 pm, Plaintiff is given a CDCR 114 Ad/Seg placement form,

19  saying that he had been retained in ASU pending further inquiry into possible enemy/safety

20  concerns at KVSP and will remain in ASU pending completion of investigation.

21       Plaintiff later learned that Alafa claimed that Plaintiff was retained in ASU based on

22  discovery of a phone call where a ranking member of the Mexican Mafia said he had heard

23  Ashker debriefing and thus Plaintiff's life was in danger.  But this was a false pretext to keep

24  Plaintiff in solitary confinement.

25       Alafa then lead an investigations unit staff on an ASU-2 raid of 14 cells, allegedly to

26  search and interview prisoners who had been housed in close proximity to Plaintiff, seeking

27  evidence of Plaintiff's safety concerns if released to G.P.  No evidence was discovered.  Four of

28  these prisoners had sent declarations in favor of Plaintiff.

1    On June 7, 2017, Alafa and a partner interviewed the AB prison-gang dropout, who was

2    the same C.I. who has sat next to Plaintiff earlier.  The C.I. claimed Plaintiff had personally told

3    him that Plaintiff told the whites on B yard he was debriefing and told the Mexicans at ASU the

4    same thing.

5    On June 8, 2017, ICC retained Plaintiff in ASU based on the phone call discussion about

6    Plaintiff requiring safety investigation.

7    After litigation, Plaintiff learned that it was Ralph Diaz, CDCR Undersecretary, who had

8    reversed ICC and retained Plaintiff in ASU.  Diaz had also emailed Kernan about this issue, and

9    Kernan let the decision stand.

10    On June 26, 2017, Alafa gave Plaintiff several disclosures prior to an ICC set for June 29.

11    On June 27, 2017, Plaintiff gave ASU-2 Captain his rebuttal memo.  Defendant Pfeiffer chaired

12    the hearing and decided "there is overwhelming evidence of safety concerns prohibiting release to

13    G.P."

14    Moments after this ICC hearing, Moak and Perez ordered Pfeiffer to have Alafa obtain

15    evidence to corroborate his C.I.'s allegations about being targeted by AB.  Moak and Perez

16    recognized that Alafa's C.I. was not credible.

17    Between July 5 and 7, 2017, Plaintiff was given additional disclosures and sent another

18    rebuttal.  Moak and Perez reviewed and investigated the points and determined they agreed with

19    Plaintiff that there was no evidence of Plaintiff ever participating in any pre-debrief/debrief

20    interviews and that Plaintiff's concerns were only about his fiancée.  They further found that the

21    allegations from C.I. dropouts were not reliable and credible.

22    Defendant Allison responded by creating additional evidence.  Plaintiff received another

23    disclosure on July 19, 2017, authored by IGI Sergeant at North Kern S.P. alleging Plaintiff was a

24    priority target of AB.  But Plaintiff claims this disclosure was made through coercion and

25    manipulation.

26    On August 4, 2017, Defendant Allison chaired a DRB hearing with Moak, Paris, Perez,

27    and Alafa.  Allison ordered Plaintiff's placement in PBSP[illegible], alleging substantial safety

28    concerns.  Defendants Allison, Moak, Prelip, Perez, and Alafa reaffirmed this decision on August

1  4, 2017, based on the pretext of a continuing threat of AB affiliated inmate IDing Ashker as a

2  target for murder.

3      In early 2018, Plaintiff alleges that he received additional disclosures and rebutted them.

4  Defendants have never produced any valid concrete evidence.  Plaintiff then summarizes

5  proceedings before District Judge Wilken regarding this issue in connection with the Settlement

6  Agreement and various disclosures and refutations to those disclosures.  Plaintiff then

7  summarizes various attempts and hearings on this issue through 2021.

8      In May 2021, Defendant Gipson decided to retain Plaintiff in ASU pending Plaintiff's

9  decision to discontinue his court challenge or final resolution of challenge by the court regarding

10  safety concerns if Plaintiff is released to G.P.

11      Thus, Plaintiff has been subjected to 52 months and counting of unwarranted solitary

12  confinement in KVSP's ASU despite zero credible enemy safety concerns.

13      Plaintiff has a protected liberty interest in being free of solitary confinement.

14      **G.     Guard One Welfare Checks**

15      Plaintiff has also bee subject to Guard-One Welfare Checks wherein every 30 minutes,

16  staff walk tiers using heavy metal pipes to strike each metal cell door.  This results in heavy pipe

17  hitting doors every half hour all day, making very loud and extremely disruptive jarring metal-

18  striking noises.  Defendants Kernan, Diaz, Allison, Alfaro, Gipson, Pfeiffer, Stebbins have

19  repeatedly been put on notice about the damaging effects of Guard One on prisoners.  Plaintiff

20  has filed repeated appeals, which have been rejected.

21      **H.     Plaintiff's Causes of Action**

22      Plaintiff's First Claim alleges that Defendants Kernan, Diaz, Allison, Alfaro, Gipson,

23  Moak, Paris, Prelip, Perez, Pfeiffer, Alafa, Hightower, Ortiz, Stebbins, Hammer, and Speidel

24  violated the First Amendment.  Plaintiff alleges that they subjected Plaintiff to retaliatory

25  punishment for exercise of his free speech and right to petition based on his role in the class

26  action, as well as his leadership role in other groups that challenge CDCR policies.  Defendants

27  denied Plaintiff assistance of counsel by imposing disproportionate punishments for alleged

28  violation of prison rules.

Plaintiff's second claim alleges that Defendants Kernan, Diaz, Allison, Alfaro, Gipson, Moak, Perez, Paris, Prelip, Pfeiffer, Alafa, Hightower, Ortiz, Stebbins, Hammer and Speidel violated his rights under the Eighth Amendment.  Plaintiff alleges that KVSP's GP's conditions are excessively restrictive and punitive.  KVSP's A Facility GP was operated akin to a modified SHU, where the majority of the prisoners warehoused spend time idle in their cells based on Defendants' failure to provide adequate space/security/supervision/qualified instructors resulting in few jobs/education/vocation/rehabilitation and self-help opportunities.  Also, there is a lack of visiting space and phone access.

Separately, on March 20, 2017, Defendants used excessive force in response to Plaintiff's peaceful protestation against wrongful return to solitary confinement.  Defendants Stebbins, Hammer, and Speidel initiated physical force that resulted in deployment of 2 gas grenades in Plaintiff's small sealed cell, turning Plaintiff's cell into a gas chamber for over 9 minutes before staff ran into the cell to forcibly apply restraints, causing Plaintiff to experience 24 hours of intense burning discomfort.

Plaintiff was retained in KVSP's solitary confinement unit.

Plaintiff is subjected to "Guard-One" policy, resulting in sleep deprivation and related emotional and physical damage.

Plaintiff's third claim for relief alleges that Defendants Kernan, Diaz, Allison, Alfaro, Gipson, Moak, Perez, Paris, Prelip, Pfeiffer, and Alafa subjected Plaintiff to indefinite solitary confinement in KVSP's ASU through systemic misuse of confidential information as a pretext to justify class action members remaining in solitary confinement in violation of the settlement agreement.  They do this by relying on fabricated, altered confidential information.

## IV.   SECTION 1983

The Civil Rights Act under which this action was filed provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for

1

redress....

2

42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely

3

provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490

4

U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see also*

5

*Chapman v. Houston Welfare Rights Org*., 441 U.S. 600, 618 (1979); *Hall v. City of Los Angeles*,

6

697 F.3d 1059, 1068 (9th Cir. 2012); *Crowley v. Nevada*, 678 F.3d 730, 734 (9th Cir. 2012);

7

*Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

8

To state a claim under § 1983, a plaintiff must allege that (1) the defendant acted under

9

color of state law, and (2) the defendant deprived him of rights secured by the Constitution or

10

federal law. *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *see also Marsh*

11

*v. Cnty. of San Diego*, 680 F.3d 1148, 1158 (9th Cir. 2012) (discussing "under color of state

12

law"). A person deprives another of a constitutional right, "within the meaning of § 1983, 'if he

13

does an affirmative act, participates in another's affirmative act, or omits to perform an act which

14

he is legally required to do that causes the deprivation of which complaint is made.'" *Preschooler*

15

*II v. Clark Cnty. Sch. Bd. of Trs*., 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*,

16

588 F.2d 740, 743 (9th Cir. 1978)). "The requisite causal connection may be established when an

17

official sets in motion a 'series of acts by others which the actor knows or reasonably should

18

know would cause others to inflict' constitutional harms." *Preschooler II*, 479 F.3d at 1183

19

(quoting *Johnson*, 588 F.2d at 743). This standard of causation "closely resembles the standard

20

'foreseeability' formulation of proximate cause." *Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d

21

1350, 1355 (9th Cir. 1981); *see also Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir.

22

2008).

23

Additionally, a plaintiff must demonstrate that each named defendant personally

24

participated in the deprivation of his rights. *Iqbal*, 556 U.S. at 676-77. In other words, there must

25

be an actual connection or link between the actions of the defendants and the deprivation alleged

26

to have been suffered by Plaintiff. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S.

27

658, 691, 695 (1978).

28

16

1    Supervisory personnel are generally not liable under § 1983 for the actions of their

2    employees under a theory of *respondeat superior* and, therefore, when a named defendant holds a

3    supervisory position, the causal link between him and the claimed constitutional violation must be

4    specifically alleged. *Iqbal*, 556 U.S. at 676-77; *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir.

5    1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978). To state a claim for relief under

6    § 1983 based on a theory of supervisory liability, a plaintiff must allege some facts that would

7    support a claim that the supervisory defendants either personally participated in the alleged

8    deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or

9    promulgated or "implement[ed] a policy so deficient that the policy itself is a repudiation of

10   constitutional rights' and is 'the moving force of the constitutional violation." *Hansen v. Black*,

11   885 F.2d 642, 646 (9th Cir. 1989) (citations and internal quotation marks omitted); *Taylor v. List*,

12   880 F.2d 1040, 1045 (9th Cir. 1989). For instance, a supervisor may be liable for his "own

13   culpable action or inaction in the training, supervision, or control of his subordinates," "his

14   acquiescence in the constitutional deprivations of which the complaint is made," or "conduct that

15   showed a reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles*,

16   946 F.2d 630, 646 (9th Cir. 1991) (internal citations, quotation marks, and alterations omitted).

## V.    ANALYSIS OF PLAINTIFF'S CLAIMS

### A.    First Amendment Retaliation

19   Plaintiff brings a First Amendment claim against Defendants Kernan, Diaz, Allison,

20   Alfaro, Gipson, Moak, Paris, Prelip, Perez, Pfeiffer, Alafa, Hightower, Ortiz, Stebbins, Hammer

21   and Speidel.  Plaintiff alleges that they subjected him to retaliatory punishment in response to his

22   lawful exercise of free speech and petition related to the class action litigation.

23   There are five basic elements to a First Amendment retaliation claim: "(1) An assertion

24   that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's

25   protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment

26   rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v.*

27   *Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). Because filing administrative

28   grievances and initiating civil litigation are protected activities, it is impermissible for prison

1    officials to retaliate against prisoners for engaging in these activities.  *Id.* at 567.

2          The Court recommends allowing this claim to proceed against all named Defendants.

3    Construing all allegations in Plaintiff's TAC in favor of Plaintiff, the Court finds that Plaintiff has

4    adequately alleged that they took an adverse action against Plaintiff, because of his protected

5    conduct, *i.e.*, his litigation in the class action case, and that action did not reasonably advance a

6    legitimate correctional goal.  This recommendation is only for screening purposes.

7          Plaintiff adds to the statement of the claim "& Related Violation of the SA," *i.e.*,

8    settlement agreement.  As noted above, the district court for the Northern District of California

9    already dismissed Plaintiff's claims for breach of the settlement agreement and for seeking

10   enforcement of the settlement agreement without prejudice to Plaintiff bringing such claims in the

11   class action through class counsel.  (ECF No. 10, at p. 2).

12         **B.     Conditions of Confinement**

13         Plaintiff next brings an Eighth Amendment claim against Defendants Kernan, Diaz,

14   Allison, Alfaro, Gipson, Moak, Perez, Paris, Prelip, Pfeiffer, Alafa, Hightower, Ortiz, Stebbins,

15   Hammer and Speidel.  Plaintiff alleges that they subjected him to excessively restricted punitive

16   conditions at KVSP's GP, which operated as a modified SHU, spending the majority of time idle

17   in cells, without adequate space, security, supervision, and instructors.  Plaintiff also alleges that

18   Defendants used excessive force in extracting him from his cell in response to his peaceful

19   protest.  Plaintiff also alleges that Plaintiff was subjected to Guard-One policies, resulting in

20   chronic sleep deprivation.

21         "It is undisputed that the treatment a prisoner receives in prison and the conditions under

22   which [the prisoner] is confined are subject to scrutiny under the Eighth Amendment."  *Helling v.*

23   *McKinney*, 509 U.S. 25, 31 (1993); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

24   Conditions of confinement may, consistent with the Constitution, be restrictive and harsh.  *See*

25   *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th

26   Cir. 2006); *Osolinski v. Kane*, 92 F.3d 934, 937 (9th Cir. 1996); *Jordan v. Gardner*, 986 F.2d

27   1521, 1531 (9th Cir. 1993) (*en banc*).  Prison officials must, however, provide prisoners with

28   "food, clothing, shelter, sanitation, medical care, and personal safety."  *Toussaint v. McCarthy*,

1   801 F.2d 1080, 1107 (9th Cir. 1986), *abrogated in part on other grounds by Sandin v. Connor*,

2   515 U.S. 472 (1995); *see also Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000); *Hoptowit v.*

3   *Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982); *Wright v. Rushen*, 642 F.2d 1129, 1132-33 (9th Cir.

4   1981).

5          Construing facts in favor of Plaintiff in this screening stage, and keeping in mind the

6   Northern District of California's holding that Plaintiff could "proceed in this action with his

7   claims for damages arising from his placement in … the ASU at KVSP," this Court recommends

8   allowing Plaintiff to proceed on a claim that his prolonged placement in the ASU at KVSP

9   subjected him to cruel and unusual punishment.  This includes his allegations that the Guard-One

10  policies subjected him to sleep deprivation.  It also includes his allegation that KVSP's GP

11  operated as a SHU with inadequate conditions of confinement.  It includes all asserted Defendants

12  except Stebbins and Hammer.

13         Regarding Plaintiff's allegations of excessive force against Defendants Stebbins and

14  Hammer in particular, in its prohibition of 'cruel and unusual punishments,' the Eighth

15  Amendment places restraints on prison officials, who may not … use excessive physical force

16  against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[W]henever prison officials

17  stand accused of using excessive physical force in violation of the [Eighth Amendment], the core

18  judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore

19  discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7

20  (1992).  When determining whether the force was excessive, the Court looks to the "extent of

21  injury suffered by an inmate. . . , the need for application of force, the relationship between that

22  need and the amount of force used, the threat 'reasonably perceived by the responsible officials,'

23  and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7

24  (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). While *de minimis* uses of physical force

25  generally do not implicate the Eighth Amendment, significant injury need not be evident in the

26  context of an excessive force claim, because "[w]hen prison officials maliciously and sadistically

27  use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503

28  U.S. at 9.

The Court recommends dismissing Plaintiff's claim to the extent it alleges a claim for excessive force in connection with his cell extraction.  Plaintiff alleges that, when staff told him to go to the ASU, "Plt. Told them to inform the supervisor that they were going to have to extract him, because such placement back in solitary was obviously part of the on-going retaliation he'd been subject to since arrival at KVSP; therefore his only recourse was to peacefully protest via refusal to voluntarily move, thereby, forcing a real investigation."  Plaintiff then alleges that Defendants Stebbins and Hammer forcibly initiated a cell extraction involving gas canisters.  Although Plaintiff alleges that he was harmed by the gas canisters, Plaintiff's allegations demonstrate that they were used to maintain and restore discipline.  There are no allegations indicating they were used maliciously and sadistically to cause harm.

### C.      Procedural Due Process

Plaintiff next alleges that defendants Kernan, Diaz, Allison, Alfaro, Gipson, Moak, Perez, Paris, Prelip, Pfeiffer, and Alafa violated Plaintiff's due process rights by fabricating and altering confidential and unreliable information provided by Defendants' recruited-collaborating prison gang dropouts as a pretext to support Defendants' agenda of keeping Plaintiff in solitary confinement.  This violated Plaintiff's liberty interest in his right to be free of such placement, which impose atypical and significant hardships on Plaintiff.

The Due Process Clause of the Fourteenth Amendment protects prisoners from being deprived of life, liberty, or property without due process of law. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974).  The procedural guarantees of the Fifth and Fourteenth Amendments' Due Process Clauses apply only when a constitutionally protected liberty or property interest is at stake. *Ingraham v. Wright*, 430 U.S. 651, 672-73 (1977).  The due process clause attaches where the restraint imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. *Sandin v. Conner*, 515 U.S. 472, 483-86 (1995).

For the purposes of screening, the Court recommends allowing this claim to proceed. While Plaintiff alleges that he received process in the form of multiple hearings and opportunities to respond, Plaintiff has alleged that Defendants systematically fabricated evidence or relied on evidence known to be unreliable in order to subject him to confinement in the ASU, which

1    imposes an atypical and significant hardship in relation to ordinary prison life.

2    **VI.      CONCLUSION AND RECOMMENDATIONS**

3        The Court hereby GRANTS Plaintiff's Motion for extension of time to respond to the

4    Court's July 29, 2021 order and to be permitted to exceed the order's specified page limit of 30

5    pages by 3 additional pages. (ECF No. 58).

6        The Court also GRANTS Defendants' Request for Screening of Plaintiff's Second

7    Amended Complaint.  (ECF No. 59).

8        The Court has screened Plaintiff's amended complaint and recommends finding that it

9    sufficiently states cognizable claims to proceed past the screening stage against (1) Defendants

10   Kernan, Diaz, Allison, Alfaro, Gipson, Moak, Paris, Prelip, Perez, Pfeiffer, Alafa, Hightower,

11   Ortiz, Stebbins, Hammer, and Speidel for retaliation in violation of the First Amendment; (2)

12   Defendants Kernan, Diaz, Allison, Alfaro, Gipson, Moak, Perez, Paris, Prelip, Pfeiffer, Alafa,

13   Hightower, Ortiz, and Stebbins for violation of the Eighth Amendment for unconstitutional

14   conditions of confinement; and (3) Kernan, Diaz, Allison, Alfaro, Gipson, Moak, Perez, Paris,

15   Prelip, Pfeiffer, Alafa for violation of the Fourteenth Amendment's Due Process Clause.  The

16   Court recommends that the claim against Defendants Stebbins and Hammer for excessive force

17   be dismissed with prejudice.

18       Based on the foregoing, it is HEREBY RECOMMENDED that:

19       1.      This case proceed on Plaintiff's claims against (1) Defendants Kernan, Diaz,

20              Allison, Alfaro, Gipson, Moak, Paris, Prelip, Perez, Pfeiffer, Alafa, Hightower,

21              Ortiz, Stebbins, Hammer, and Speidel for retaliation in violation of the First

22              Amendment; (2) Defendants Kernan, Diaz, Allison, Alfaro, Gipson, Moak, Perez,

23              Paris, Prelip, Pfeiffer, Alafa, Hightower, Ortiz, and Stebbins for violation of the

24              Eighth Amendment for unconstitutional conditions of confinement; and (3)

25              Kernan, Diaz, Allison, Alfaro, Gipson, Moak, Perez, Paris, Prelip, Pfeiffer, Alafa

26              for violation of the Fourteenth Amendment's Due Process Clause; and

27       2.      All other claims be dismissed, with prejudice.

28       These findings and recommendations will be submitted to the United States district judge

1   assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within twenty-one

2   (21) days after being served with these findings and recommendations, Plaintiff may file written

3   objections with the Court.  The document should be captioned "Objections to Magistrate Judge's

4   Findings and Recommendations."  Plaintiff is advised that failure to file objections within the

5   specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834,

6   838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

7

8   IT IS SO ORDERED.

9       Dated:   **December 16, 2021**       /s/ *Erica P. Grosjean*

10                                          UNITED STATES MAGISTRATE JUDGE